# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

ESO RAZIC, a/k/a Esad Razic, a/k/a Brico,

        Defendant.

No. C18-1001-LTS

**MEMORANDUM OPINION AND ORDER**

## I.     INTRODUCTION AND PROCEDURAL HISTORY

This is a civil denaturalization case pursuant to 8 U.S.C. § 1451(a), in which the plaintiff (the Government) seeks to revoke the naturalized citizenship of defendant Eso Razic.  The Government alleges Razic fraudulently and unlawfully procured refugee status, and eventually naturalized United States citizenship, by concealing and misrepresenting his military involvement during the Balkans Conflict in the early 1990s and his participation in persecutory acts during that time.  *See* Doc. 1 at 1.  The Government alleges the following causes of action:

- Count I – Illegal procurement of naturalization lack of good moral character (unlawful act adversely reflecting on moral character)

- Count II – Illegal procurement of naturalization not lawfully admitted for permanent residence (procured by fraud or willful misrepresentation)

- Count III – Illegal procurement of naturalization not lawfully admitted for permanent residence (persecutor ineligible for admission as refugee)

- Count IV – Procurement of United States citizenship by concealment of a material fact or willful misrepresentation

*Id.* at 10-16.

I conducted a three-day bench trial beginning November 13, 2019. *See* Docs. 63-65. Prior to trial, I entered a Final Pretrial Order (Doc. 60) that included stipulations of fact by the parties and also identified pending evidentiary issues. I allowed the parties to make a full evidentiary record at trial with the exception of testimony from two defense witnesses. I reserved ruling on all other issues raised in the parties' motions in limine until after trial. Doc. 61.

At trial, the Government presented expert witness testimony from Dr. William Tomljanovich and Hillary Hoover. *See* Doc. 65-1. The Government also submitted deposition testimony from Robert Rebac, Stefa Misita and Milan Bekan. Docs. 65-18; 65-20; 65-21. At the close of the Government's case, Razic moved for a directed verdict, which the Government opposed. *See* Doc. 71 at 34-35. I reserved ruling. Razic testified on his own behalf and presented testimony from his wife, Videla Razic and brother, Ejub Razic. *Id.* At the close of his case and the Government's rebuttal evidence, Razic renewed his motion for directed verdict. I again reserved ruling. *Id.*

Following the trial, and upon completion of the trial transcript, the parties submitted supplemental briefs to address pending evidentiary issues in light of the trial record. *See* Docs. 76, 77. I entered an order (Doc. 79) on the pending evidentiary issues on April 29, 2020. I then allowed the parties to submit briefs on the merits. *See* Docs. 81, 86 and 89. On October 8, 2020, I heard closing arguments by telephone.

Having carefully considered all of the evidence, briefing and arguments, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.    FINDINGS OF FACT

1.    In 1992, Razic, Videla[1] and their son, Denis, were living in the village of Tasovcici in Bosnia.

2.    Razic, an ethnic Muslim, was working as a barber and was known by the nickname "Brico," meaning "barber." His barbershop was located near the connecting road between Tasovcici and the town of Capljina.

3.    Videla, an ethnic Serb, was completing her degree in elementary school education.

4.    In addition to Bosniaks (predominantly Muslim) and Serbs (predominantly Eastern Orthodox), a third ethnic and religious group in Bosnia at this time was the Croats (predominantly Roman Catholic).

5.    In 1991, Slovenia and Croatia attempted to secede from Yugoslavia.[2]

6.    In early 1992, the Republic of Bosnia held a referendum on independence from Yugoslavia. The Serbs largely boycotted the referendum and favored remaining with Yugoslavia. The Bosniaks and Croats supported the measure.

7.    In April 1992, Bosnia became an independent state, although it was not immediately recognized as such by other countries.

8.    The Serbs then attacked the new state's government with support from the federal Yugoslav People's Army (JNA).

9.    Bosniaks and Croats jointly defended the new republic of Bosnia and Herzegovina. Each group had its own military force. The Bosniaks formed the Army

---

[1] To avoid confusion, I will refer to defendant Eso Razic as Razic throughout this order and to his wife, Videla Razic, by her first name.

[2] The following history of the region comes from Dr. Tomljanovich's testimony. *See* Doc. 70 at 20-28.

of the Republic of Bosnia and Herzegovina (ABiH) and the Croats formed the Croatian Defense Council (HVO). While the two groups initially allied against the Serbs, this partnership deteriorated in 1993 and led to conflict in Bosnia.

10. In August 1992, the HVO divided each territory of Bosnia into four operational zones and each operational zone into brigades centered on a municipality.

11. The First Brigade, "Knez Domagoj," was headquartered in Capljina, which is both a municipality and a town inside the municipality.[3]

12. Although formed by the Croats, the HVO was very organized and successful at recruiting Bosniaks at the beginning of the war in 1992.

13. In early 1992, Serbs occupied the east bank of the Neretva River (including Tasovcici) and Croats occupied the west bank (including Capljina).

14. On June 7, 1992, the HVO and HOS[4] launched Operation Jackal to drive Serbs out of the area. The HVO controlled the entire region by the first or second day of the operation.

15. During this operation, Milan Misita, an unarmed ethnic Serb living in Tasovcici, was killed. His wife, Stefa Misita, was told by a neighbor (Iva Preradovic) and Razic's father-in-law (Scepo Bekan) that Razic and Edo Sakoc had captured Milan and intended to turn him into the HVO or HOS. However, they encountered three HVO soldiers on their way to Capljina, one of whom (Zlatko Vegar) shot Milan.

16. In April 1993, fighting broke out between the HVO and ABiH, with HVO units killing and expelling local Bosniaks and ABiH units committing massacres against Croat civilians. Individuals in mixed marriages were particularly vulnerable to persecution. The HVO began detaining Bosniaks at prison camps around this time.

---

[3] The Razics' village of Tasovcici is located within the Capljina municipality across the Neretva River from the town of Capljina. Capljina was comprised primarily of Croats, but all three ethnic groups were present in this area.

[4] The HOS, a smaller Croat paramilitary group, was absorbed by the HVO in late 1992.

17.     On June 30, 1993, General Petkovic of the HVO ordered the arrest and detention of all military-age Bosniak males, including those Bosniak males fighting within the HVO.

18.     In August 1993, the HVO began releasing Bosniaks from prison camps who had served in the HVO prior to being detained.  They were told to leave the country.

19.     By September 1993, nearly all Bosniaks in Capljina had been expelled.

20.     According to Razic and his wife, Videla and Denis fled to Croatia in April 1992.  Razic went to live in Videla's uncle's apartment in Capljina.  Videla and Denis returned at the end of June 1992.  By that time, the Razics' home had been burned down and the barbershop damaged from grenades.  The family lived in the apartment in Capljina and Razic repaired and reopened the barbershop.  The situation was relatively stable between July 1992 and June 1993.  When the conflict between the Muslims and Croats erupted, Razic, his brother Ejub (who lived in Croatia) and a Croat friend, Goran Tomicic, developed a plan to smuggle the Razics out of Bosnia and into Croatia.  Videla and Denis left in July 1993, Razic's parents left in August 1993 and his brother Enes' family left in September 1993.  While Razic was planning to escape the morning of October 2, 1993, he was allegedly forced at gunpoint by Robert Rebac to a post on the frontline at Kvanj hill.  While on the frontline, Razic testified he was ordered by Mizra Kudra and Rebac to cross over and surrender to the ABiH.  He did so and was imprisoned for two months until his captors assured themselves he was a Muslim civilian and not an enemy soldier.  Razic then spent 10 months living with his aunt in Bosnia before he was smuggled out of Bosnia and into Germany with the help of his brother.  There, he was reunited with Videla, Denis and his other son, Teo (born in September 1993).  The family lived as refugees in Germany until 1998 before applying for refugee status in the United States.

21.     According to the Government, Razic was a member of the HVO with his service beginning no later than July 1, 1992, and ending upon his surrender to the ABiH in October 1993.  The Government relies on the certified master rolls of the HVO's 50th

Home Guard Regiment (successor to the HVO's "Knez Domagoj" Brigade) and a certified printout of an electronic list of members of the 50th Home Guard Regiment. *See* Docs. 65-33; 65-34. It also cites attendance rosters, *see* Docs. 65-35; 65-36; 65-37; 65-38; 65-39; 65-40; 65-41, and payroll records. *See* Docs. 65-16; 65-21. These documents contain Eso Razic's name, his purported signature (a point of dispute between the parties) and personal identifiers (father's name, birthplace, birthdate).

22.     The Government also offers a different account of the Kvanj hill incident in October 1993 and Razic's actions on that date.[5] It contends that Rebac and Razic were in the same HVO unit. Because the Bosniaks and Croats had begun fighting around this time and both Bosniaks and Croats served in the HVO, the Government contends that upon learning the HVO had begun detaining families of Bosniak HVO members, Razic and other Bosniak members of his unit developed a plan to turn over their Croat compatriots to the Bosniak-majority ABiH. Kvanj hill was near the dividing line between HVO and ABiH forces. The Government maintains that Razic killed two Croats (Ivica Bunoza and Martin Markovic) at Kvanj hill while HVO commander Kudra detained Rebac, also a Croat. The Government argues Razic then arrested Rebac and another Croat soldier, Nedjo Pehar, and crossed the frontline to surrender to nearby ABiH soldiers.[6] Razic was then detained at the ABiH prison camp in Mostar.

23.     On March 20, 1998, Razic filed a Form I-590, Registration for Classification as Refugee with the former United States Immigration and Naturalization Service (INS). *See* Doc. 65-3 at 24-26. The application references a separate statement.

---

[5] This account is primarily based on Rebac's deposition testimony. *See* Doc. 65-21.

[6] Notably, Rebac testified that at some point he was captured and his hands were tied around his back, but that ultimately he was released to bring the Bosniaks' families to the frontline to exchange them for Pehar. Doc. 65-24 at 30. Rebac acknowledged that, at this time, Razic had already made sure his parents were safe. *Id.* at 20.

24.     A separate handwritten statement, bearing a signature for Eso Razic, is in the A File and describes the following:

- In the summer of 1992, they lost their house and shop and Razic fled to Capljina with his wife and son until she and their son could go to Zagreb, Croatia, where his brother lived.

- On August 10, 1993, he was captured and taken to the detention camp Dretelj

- He and 15 others fled the camp on September 28, 1993.  Only 7 survived when they reached Bosnian territory on October 2, 1993.  There, he and his acquaintances were taken to the prisoners' camp in Mostar

- The [United Nations High Commissioner for Refugees] registered them and 10 days later they received a certificate of release from the prison and were liberated on November 12, 1993.  He spent 43 days in the camp.

- Through the Red Cross, he received a message from his wife in April 1994, informing him of the birth of his second son in September 1993.  He reunited with his family in Germany in September 1994.

Doc. 65-4 at 1-4.[7]

25.     Form I-590 contains the following information under the heading "Military service":

| 13.  Military service | | | | |
|---|---|---|---|---|
| Country | Branch and organization | Dates | Serial No. | Rank attained |
| former Yugoslavia | administration — service | MAY 85 – MAY 86 | unknown | private |

Doc. 65-3 at 25.  The form states "None" with regard to "Political, professional or social organization of which I am now or have been a member or with whom I am now or have been affiliated since my 16th birthday."  *Id.* at 24.

---

[7] Razic denies that he wrote this statement or signed it and denies that he was ever at Dretelj.  *See* Doc. 72 at 21.  The Government's handwriting expert, Hillary Hoover, reached no conclusion as to whether the signature on the statement was Razic's.

26.     Razic also submitted Form G-646 Sworn Statement of Refugee Applying for Entry into the United States.  He certified that none of the listed classes making an alien inadmissible to the United States applied to him.  Among the listed classes were "Aliens who have committed or who have been convicted of a crime involving moral turpitude (does not include minor traffic violation)" and "Aliens who have procured or attempted to procure a visa by fraud or misrepresentation."  Doc. 65-4 at 5.

27.     INS approved Razic's refugee form and classified him as a refugee.  Doc. 65-3 at 24.

28.     Razic and his family moved to the United States from Germany in 1998, eventually settling in Dubuque, Iowa.

29.     On August 2, 1999, Razic applied to be a lawful permanent resident by filing Form I-485 Application to Register Permanent Residence or Adjust Status.  Doc. 65-3 at 3-10.

30.     Razic listed "none" for "present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place since [his] 16th birthday," including "any foreign military service."  *Id.* at 4.

31.     Razic answered "No" to the following questions in Part 3:

- Question 1.a – "Have you ever, in or outside the U.S. . . . knowingly committed any crime of moral turpitude . . . ?"

- Question 4 – "Have you ever engaged in . . . or have you through any means ever assisted or provided any type of material support to, any person or organization that has ever engaged, or conspired to engage, in sabotage, kidnapping, political assassination, hijacking, or any other form of terrorist activity?"

- Question 8 – "Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion?"

*Id.* at 5.

32.     In Part 4, Razic signed the form under penalty of perjury, certifying the information it contained was true and correct.  *Id.* at 6.

33.     INS approved Form I-485 on February 22, 2001, granting Razic permanent resident status retroactive to July 31, 1998, the date of his admission as a refugee.  *See id.* at 2 (Form I-181 Memorandum of Creation of Record of Lawful Permanent Residence).

34.     On May 6, 2003, Razic filed Form N-400 Application for Naturalization with United States Citizenship and Immigration Services (USCIS).  Doc. 65-2 at 4-15.

35.     In Part 1, he left blank the section asking him to provide any other names he had used.  *Id.* at 4.  He also answered "No" to the following questions:

- Part 10.B, Question 8.a. – "Have you **EVER** been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?"

- Part 10.B, Question 11 – "Have you **EVER** persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion?"

- Part 10.D, Question 15 – "Have you **EVER** committed a crime or offense for which you were NOT arrested?"

- Part 10.D, Question 23 – "Have you **EVER** given false or misleading information to any U.S. government official while applying for any immigration benefit . . . ?"

- Part 10.D, Question 24 – "Have you **EVER** lied to any U.S. government official to gain entry or admission into the United States?"

*Id.* at 10-11 (all emphases in original).

36.     Razic signed the application, certifying under penalty of perjury that the contents of the application were true and correct.  *Id.* at 13.

9

37.     USCIS approved his application for naturalization on January 12, 2004.  *Id.* at 4.

38.     On March 26, 2004, Razic took the oath of allegiance, admitting him to United States citizenship.  *Id.* at 1, 2.

39.     He was issued Certificate of Naturalization No. 27562437.  *Id.*

40.     The Razic family has stayed in the Dubuque area since 1998 with Videla working at a financial company and Razic as a truck driver.

## III.     *HOOVER'S TESTIMONY AND OUTSTANDING EVIDENTIARY RULINGS*

In my order (Doc. 79) on the evidentiary issues, I reserved ruling on certain exhibits based on my findings regarding Hoover's testimony.  These exhibits include a statement allegedly written and signed by Razic in his A File (Exhibit 1); a payroll document (Exhibit 13); and certain documents provided by the Government of Bosnia and Herzegovina (Exhibits 37 to 39).  I overruled Razic's objections to Hoover's examination worksheets (Exhibits 23 and 24).  *See* Docs. 65-25 and 65-26.

Hillary Hoover is a forensic document examiner at the Homeland Security Investigations Forensic Laboratory in McLean, Virginia.  Doc. 71 at 15.  She holds a master's in forensic science and in 2009 through 2011, completed a training program with the Homeland Security Investigations Forensic Laboratory as an apprentice forensic document examiner before receiving her own cases.  *Id.* at 16.  *See also* Doc. 65-23 (statement of qualifications).  Razic did not object to her designation as an expert in the field of handwriting comparison.  *Id.* at 17.

For this case, Hoover was asked to compare questioned signatures to provided known signatures to determine whether they were prepared by the same individual.  *Id.* She testified she followed her usual procedure by evaluating the questioned signatures independently of the known signatures to determine whether they were consistent or distorted, whether they appeared freely and naturally prepared and whether they were originals or copies.  *Id.* at 18.  She then evaluated the known signatures for the same

characteristics. *Id.* She determined that each set was comparable and then conducted a side-by-side comparison of the questioned and the known signatures where she examined various characteristics such as slant, letter formation, connecting strokes, height relationships between letters, and placement of writing relative to a baseline. *Id.* She formed an opinion, which was then verified by another examiner who independently conducted an examination. This opinion was then submitted to a supervisor for administrative review. *Id.*

Hoover testified that the laboratory uses a seven-point scale, which she described as follows:

- Identification – strongest finding for common authorship; determining that the person who wrote the known writing prepared the questioned writing

- Probable finding – strong finding; falling just short of a virtually certain degree of confidence; all of the characteristics are in agreement with maybe some limitations

- Indication – weak finding; few characteristics that are of significance, but those few characteristics are in agreement with one another

- No conclusion – no leaning one way or another

- Indication – weak finding; few characteristics that are of significance, but those few characteristics are not in agreement with one another

- Probably not – strong finding that the person who wrote the known writing did not write the questioned

- Elimination – person is excluded as having written what is in question

*Id.* at 18-19.

Hoover examined six questioned signatures. *Id.* at 19. She examined questioned signatures from a payroll document (Exhibit 14)[8] dated January 13, 1993 (Doc. 65-17) and a payroll document of the First Battalion "Support" or "Escort" Platoon (Exhibit 13) dated November 1992 (Doc. 65-16). She compared these with known signatures from the following documents:

- Form I-485 Application to Register Permanent Residence or Adjust Status (Doc. 65-3 at 3-7)

- Form G-325A Biographic Information (Doc. 65-3 at 11)

- Form I-590 Registration for Classification as Refugee (containing two separate signatures) (Doc. 65-3 at 24-25)

- Form G-325C Biographic Information (Doc. 65-4 at 6)

- 1-551 QR I-586 Card Data Collection Form (containing two separate signatures) (Doc. 65-4 at 17-18)

---

[8] I sustained Razic's authentication objection to Exhibit 14 because the Government's stated basis from Bekan's deposition was not in evidence. *See* Doc. 79 at 19. However, as the Government has pointed out, it cited Bekan's deposition as the basis for authentication in its pretrial submission but added Hoover's and Dr. Tomljanovich's testimony as additional grounds for authentication in its evidentiary brief. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). While Hoover's testimony may assist in authentication of the signature on the document, her testimony fails to authenticate the document itself. With regard to Dr. Tomljanovich's testimony, he testified that the document was created as a part of a regular recurring activity of paying the soldiers of the units and that he believed it was an authentic copy of the December 1992 payroll for the Independent Company of Diversionary Troops of the HVO. Doc. 70 at 31. Earlier in his testimony, regarding Exhibit 13, he stated he had encountered similar payroll accounting documents in his work, noting that Exhibit 13 had the same sort of format and content that he would see in other pay records. Exhibit 14 has a similar format and content as Exhibit 13. Given its similarity to Exhibit 13, and the fact that the Government did cite Dr. Tomljanovich's testimony as a basis for authentication in its post-trial evidentiary brief (Doc. 76 at 8-10), my previous ruling as to this exhibit is vacated and Razic's objection overruled. Exhibit 14 is received into evidence.

Doc. 65-25.  She also examined questioned signatures from certified monthly attendance records (Exhibits 37, 38, 39) of the Independent Commando Company and Knez Domagoj Brigade, dated January, February and March 1993.  *See* Docs. 65-39, 65-40, 65-41.  The sixth questioned signature came from a "separate statement" that was purportedly submitted with Razic's Form I-590 Registration for Classification as Refugee.  *See* Doc. 65-3 at 24-25 (Form I-590 referencing separate statement); Doc. 65-4 at 1-4 (containing handwritten statement and translation bearing signature for Eso Razic).[9]  She compared these with the previous known signatures and two known signatures from a certified traffic ticket (Exhibit 22; Doc. 65-24).

Hoover concluded five out of the six questioned signatures were probably written by the writer of the known writing.  She had no conclusion as to the sixth signature (the signature on the separate statement).  *Id.*  Hoover noted there were some limitations to her examination, including that all of the signatures were photocopies rather than originals and there were some unexplained variations such as features in the questioned writing that were not accounted for in the known writing.  *Id.* at 20.  However, she determined that variations were not fundamental differences and not significant.  *Id.* at 21.  She explained that without originals, she could not reach an identification finding – the strongest finding.  *Id.*  Hoover then testified about the specific similarities between the questioned and known signatures, which are also discussed in Exhibits 23 and 24.

Razic challenges Hoover's testimony because she did not compare the roster signatures to signatures of other plausible writers.  Doc. 86 at 39.  He theorizes that Rebac and Kudra forged his signature to collect his "ghost payroll" salary.  He cites to Hoover's deposition (which is not in evidence) and a law review article addressing the need for handwriting examiners to compare a suspected signature to writing samples from other plausible writers outside the target of the investigation.  *See id.* at 39-40.  The

---

[9] Razic testified that he did not write or sign the separate statement.  *See* Doc. 72 at 21.

Government argues that given the similarities between the signatures on the rosters and Razic's known signatures, it defies logic that someone else would have signed for him. Doc. 81 at 17-18. Because Hoover's deposition is not in evidence and Razic did not cross-examine Hoover on this subject during trial, I find it inappropriate for me to consider this argument as a reason for discrediting her testimony.

I find no reason to discredit Hoover's testimony. However, I do not find it to be particularly probative of the ultimate factual issues – whether Razic was a member of the HVO or was involved in persecutory acts. While Hoover's testimony establishes that the signatures on the HVO payrolls are "probably"[10] Razic's, she testified she could not make an identification finding (the strongest finding) because she did not have original documents to examine. Doc. 71 at 20. Without the originals, she could also not rule out tracing or a digital manipulation. *Id.* The larger issue in this case is not whether the signatures are Razic's, but whether these documents – with or without Razic's signatures – are sufficient to establish his membership in the HVO. Hoover's testimony and examination provides little substantive value to that issue.

With regard to Razic's hearsay objections to Exhibits 1, 13, 14 and 37 through 39 based on Hoover's testimony, these are overruled. I accept Hoover's testimony that the signatures on these documents are "probably" Razic's signatures. This supports a finding that the statements in these documents constitute statements by an opposing party that are admissible under Rule 801(d)(2). I do not find Hoover's testimony or these documents dispositive, however, to the issues of Razic's membership in the HVO and participation in persecutory acts, which will be discussed in greater detail below.

---

[10] Hoover testified that "[p]robable is a strong finding that the person who wrote the known writing probably prepared the questioned writing. It just falls short of the virtually certain degree of confidence." Doc. 71 at 19.

## IV.   ANALYSIS AND CONCLUSIONS OF LAW

### A.   *Applicable Law*

"[T]he Government 'carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship'" because the loss of American citizenship can have "severe and unsettling consequences." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981) (quoting *Costello v. United States*, 365 U.S. 265, 269 (1961)).   The Supreme Court has explained:

> Denaturalization consequences may be more grave than consequences that flow from conviction for crimes. . . . This Court has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty.   The consequences of such a deprivation may even rest heavily upon his children. 8 U.S.C. § 719, 8 U.S.C.A. § 719.

*Klapprott v. United States*, 335 U.S. 601, 611-12 (1949).   Thus, "[t]he evidence justifying revocation of citizenship must be 'clear, unequivocal, and convincing' and not leave 'the issue in doubt.'" *Fedorenko*, 449 U.S. at 505 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125 (1943)).   "This burden is substantially identical with that required in criminal cases – proof beyond a reasonable doubt." *Klapprott*, 335 U.S. at 612.   "[T]he facts and the law should be construed as far as is reasonably possible in favor of the citizen." *Schneiderman*, 320 U.S. at 122.

Under 8 U.S.C. § 1429, "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this chapter."   The Government may file a complaint to revoke naturalization if the citizen's naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a).   "A naturalization is illegally procured if an applicant fails to comply strictly with all of the congressionally imposed prerequisites to the acquisition of citizenship." *United States v. Friedrich*, 402 F.3d 842, 844 (8th Cir. 2005).   One of the prerequisites for naturalization is that an applicant must have been "lawfully admitted to the United States for permanent

residence." 8 U.S.C. §§ 1427(a)(1), 1429. Classes of aliens ineligible for admission include "[a]ny alien, who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under [8 U.S.C. § 1182]." 8 U.S.C. § 1182(a)(6)(C)(i).

One who becomes a lawful permanent resident (or "adjusts status") as a refugee must also be "admissible"[11] and meet the definition of a refugee. *See* 8 U.S.C. §§ 1159(a)(1), 1157(c)(1); 8 U.S.C. § 1101(a)(42). A refugee is generally defined as someone who "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." *Id.* A person who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion" is not considered a "refugee." *Id.*

Another prerequisite for naturalization is that the person be of "good moral character" for the five-year statutory period before he or she files Form N-400 and continuing until the time he or she takes the oath of allegiance and becomes a United States citizen. 8 U.S.C. § 1427(a)(3). Congress has enumerated various acts or categories of acts that constitute lack of good moral character. *See* 8 U.S.C. § 1101(f)(1)-(9). There is also a catch-all provision stating "[t]he fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." *Id.* § 1101(f).

To prove a citizen's naturalization was "procured by concealment of a material fact or by willful misrepresentation," the following elements must be met: "(1) the naturalized citizen must have misrepresented or concealed some fact; (2) the

---

[11] *See* 8 U.S.C. § 1182 (listing classes of aliens ineligible for admission).

misrepresentation or concealment must have been willful; (3) the fact must have been material; and (4) the naturalized citizen must have procured his citizenship as a result of the misrepresentation or concealment." *United States v. Hirani*, 824 F.3d 741, 748 (8th Cir. 2016) (citing *Kungys v. United States*, 485 U.S. 759, 767 (1988)). A misrepresentation is "willful" if it was "deliberate and voluntary." *Id.* at 749. It does not require intent to deceive. *Id.* "[T]he test of whether [the defendant's] concealments or misrepresentations were material is whether they had a tendency to influence the decisions of the Immigration and Naturalization Service." *Kungys*, 485 U.S. at 772. Misrepresentations or concealments have such a tendency "if the true [representation] would predictably have disclosed other facts relevant to [the applicant's] qualifications." *Id.* at 774. "An applicant 'procures' naturalization on the basis of a misrepresentation if there is a causal connection between the misrepresentation and the acquisition of citizenship." *Hirani*, 824 F.3d at 750.

## B.     *The Government's Case*

The Government seeks to revoke Razic's Certificate of Naturalization on the grounds that he illegally procured his United States citizenship because at the time of naturalization, he: (1) lacked good moral character (Count 1); (2) was never lawfully admitted for permanent residence because he was inadmissible based on fraud (Count 2); and (3) was never lawfully admitted for permanent residence because he was ineligible for refugee status as a persecutor (Count 3). It also seeks revocation of Razic's naturalization because he procured his naturalization by concealment of a material fact or willful misrepresentation (Count 4). The Government's case requires proof that Razic (1) was in fact a member of the HVO or (2) participated or assisted in acts of persecution or moral turpitude. If the Government proves Razic's membership in the HVO or involvement in acts of persecution or moral turpitude, I will then turn to the specific elements of each count.

### 1. Was Razic a Member of the HVO?

The Government's evidence concerning Razic's membership in the HVO consists of the following exhibits:[12]

- Exhibit 13 – Payroll, First Battalion "support" or "escort" platoon, November 1992 (Doc. 65-16)

- Exhibit 14 – Payroll, "Independent Commando Company" (Doc. 65-17)

- Exhibits 18 and 19 – Video deposition and transcript of Robert Rebac (Doc. 65-21)

- Exhibits 23 and 24 – Examination worksheets from Hoover (Docs. 65-25, 65-26)

- Exhibit 30 – Certified excerpt of list of members of HVO 31st Home Guard Battalion, Knez Domagoj Brigade (#608) (Doc. 65-32)

- Exhibit 31 – Certified excerpt of VOB-8 list of members of the HVO 50th Home Guard Battalion, Knez Domagoj Brigade (#356) (Doc. 65-33)

- Exhibit 32 – Certified excerpt of list of 50th Home Guard Battalion, Knez Domagoj Brigade (#4766) (Doc. 65-34)

- Exhibits 33 to 36 – Certified monthly attendance records, Independent Commando Company, Knez Domagoj Brigade, for August 1992; September 1992; October 1992; December 1992 (Doc. 65-35 through 65-38)

- Exhibits 37 to 39 – Certified pay records of Independent Commando Company, Knez Domagoj Brigade for January 1993; February 1993, March 1993 (Doc. 65-39 through 65-41)

The Government also relies on the expert testimony of Dr. Tomljanovich and Hoover.

---

[12] While the Government submitted Exhibit 15 (transcript of deposition of Milan Bekan), it does not refer to this exhibit in its merits briefing. I have considered it but do not find it probative of the Government's case. Bekan, who investigated war crimes in the Capljina area and wrote a report of his investigation, testified that at the time he wrote the report he did not have any information that Razic participated in any activities that could be considered war crimes. Doc. 65-18 at 9.

Exhibit 13, dated November 1992, is a payroll record for the First Battalion "support" or "escort" platoon. Doc. 65-16. For each listed member, it lists the member's first and last name, the member's duty, the number of days present, the amount for payout and a signature. *Id.* Similarly, Exhibit 14 is titled "Personnel Salaries for the Month of December 1992" for the Independent Commando Company. *See* Doc. 65-17. Again, it lists each member's first and last name, the payout amount and a signature to indicate that the salary was "received." *Id.* Dr. Tomljanovich testified about his familiarity with such records and indicated that both the First Battalion and Independent Commando Company were part of the HVO. *See* Doc. 70 at 29-31. Exhibit 13 states "Croatian Defense Council" at the top of the document. The signatures for "Eso Razic" on each form are the subject of Hoover's analysis, described in Exhibits 23 and 24. *See* Docs. 65-25, 65-26.

Rebac testified that he was, himself, a member of the HVO and was affiliated with the First Herzegovinian Brigade.[13] Doc. 65-21 at 11. Rebac was shown Exhibit 13 and indicated it was a reconnaissance platoon within this brigade. *Id.* at 12. He stated he was a commander of a small number of people within the platoon and identified his signature at line 17 on the document, stating he signed it to be paid in the amount shown. *Id.* at 13. Rebac testified he personally knew most of the individuals listed on the document, including Razic. *Id.* at 14. He identified Razic as the person shown in five photographs of Razic that were presented to him. *Id.* at 14-15. With regard to reassignments among platoons in the HVO, Rebac testified that "people would come and go" because things were "not very strict" and sometimes you would not see people who were officially registered as members of the unit. *Id.* at 25. For instance, he stated that only five or six people would go on reconnaissance instead of all of the members in the

---

[13] Rebac agreed it was also referred to by another name, but that part of the deposition is inaudible. *See* Doc. 65-21 at 12; Exhibit 19.

unit. *Id.* at 26. He testified he saw Razic regularly but did not state in what capacity. He stated Razic was not in the section he commanded.

With regard to Razic's duties, he testified "[i]t wasn't much involved, and if, and then I just registered as one of them. It's been . . . I mean this was a long time ago. It's difficult for me to remember details." *Id.* at 25. With regard to Exhibit 13, he stated: "It was just, like, a record. A record. They were recorded as, as present, but sometimes they were not even physically present there, let alone engaged in action. They were present only when, to sign when we needed to collect their salary." *Id.* at 35-36. Rebac was not asked if Razic was in the HVO.

Exhibit 30 is titled "List of HVO Directors in the Area of the Municipality of Capljina." *See* Doc. 65-32. All names are redacted on this exhibit except for at #608, which lists Razic's surname, father's name and first name, his JMBG number, place of birth, "Name VJ HVO"[14] and time of employment. The name, father's name, JMBG number and place of birth are all accurate for Razic.[15] His time of employment is listed as April 4, 1992, through July 1, 1993. *Id.*

Exhibit 31 is a VOB-8[16] list of military personnel for "50 D.P. HNO Knez Domagoj." Doc. 65-33. It is redacted except for entries 356 and 357, containing the name "Eso Razicm Vesil," Razic's JMBG number date of birth, date of joining as July 1, 1992 and date of entry as September 4, 1993. *Id.* There is nothing listed for a date of departure. *Id.*

---

[14] Dr. Tomljanovich testified this related to military specialty because the word listed in this entry was for scout, ranger or reconnaissance troop. Doc. 70 at 44. He also testified that the last date of employment, July 1, 1993, is significant because the order to detain all military-age Bosniak males, including those fighting within the HVO, was issued the preceding day. *Id.*

[15] The parties have stipulated as to Razic's date of birth, place of birth, father's name and JMBG number. *See* Doc. 60 at 2-3. They are correctly identified in the Government's exhibits.

[16] Dr. Tomljanovich explained that a VOB-8 is kept by the Ministries for Veteran's Affairs to determine if somebody is eligible for benefits concerning military service. Doc. 70 at 41.

Dr. Tomljanovich testified that Exhibit 32 was a redacted list of the members of what was then the 50th Home Guard Regimen of the HVO Knez Domagoj. Doc. 70 at 43. Exhibit 32 contains Razic's surname, first name, father's name, JMBG number and lists dates of July 1, 1992 and April 4, 1993 at entry 4766. *See* Doc. 65-34. Dr. Tomljanovich stated it contains the same information as the VOB-8 (Exhibit 31).

Dr. Tomljanovich explained that many of these documents were produced based on a request sent by the United States to the Ministry of Justice in Bosnia on June 21, 2018. *See* Doc. 70 at 40-41 (explaining Exhibits 26, 27 and 28). Specifically, Exhibit 30 was created in 1999 in response to an oral command from a commander of the first corps Mostar about members of the 31st Home Guard Regimen of Capljina of Muslim-Bosniak nationality. *Id.* at 43-44 (discussing Exhibit 29 and 30). The document was sent to the first corps Mostar, the office for defense of Capljina, which Dr. Tomljanovich explained was the department responsible for keeping military service records. *Id.* at 43. With regard to when Exhibits 30 through 32 were created, Exhibit 31 was created after September 4, 1993. Doc. 70 at 42. Exhibit 32 was created in 1994 or later because it reflected the unit name change[17] and was an electronic document. Doc. 70 at 43. Exhibit 30 was created in 1999. *Id.* at 44; Doc. 65-31.

Exhibits 33 through 36 consist of attendance records for various months in 1992 and 1993. They provide a name, duty,[18] and whether the individual was present for each day of the month. Doc. 70 at 44 (discussing Exhibit 33). They are all redacted except for one entry in each document for Eso Razic. Exhibit 33 is signed by the brigade commander and someone else on behalf of the main staff military police as indicated by a seal. While Dr. Tomljanovich recognized the name of the commander, he did not recognize the name of the individual signing on behalf of the main staff military police.

---

[17] From 31st Home Guard to 50th Home Guard. *See* Doc. 70 at 44.

[18] Dr. Tomljanovich testified that the duty "VP" is a Croatian abbreviation for military police. Doc. 70 at 44.

*Id.* Exhibit 34 is a military police monthly attendance roster for September 1992. *Id.* at 45. The document indicates Eso Razic served as a military policeman and showed him present every day of the month. *Id.* Exhibit 35 is the same type of document for October 1992. Razic was listed as present every day up to October 23. Dr. Tomljanovich stated a notation in the document indicates he was relieved of duty of the military police on October 24, 1992. *Id.*

Exhibit 36 is an attendance record for the Independent Company of Diversionary Troops or Commandos, third platoon, for December 1992. *Id.* The entry for Eso Razic indicates he was a commander of a section and present for every day of the month. *Id.* This document is signed by the commander of the platoon, Amer Kudra, the commander of the company (although the signature is illegible) and someone for the personnel service. *Id.* at 46. Exhibit 37 is a pay record for January 1993 for the Independent Commando Company, dated February 22, 1993. *Id.* Exhibit 38 is the same type of document for February 1993, dated March 23, 1993. *Id.* Exhibit 39 is the same type of document for March 1993, dated April 23, 1993. *Id.* at 47. Dr. Tomljanovich testified that all of the pay record documents were created by the authority paying these soldiers, which would often be the municipal office for defense. *Id.*

The Government argues the evidence shows Razic entered service in the HVO no later than July 1992 and served until October 1993. Doc. 89 at 10. It contends he was a member of the Knez Domagoj Brigade, or First Brigade and in August, September and October 1992 was assigned to the Military Police Company of the Knez Domagoj Brigade. It states that on October 24, 1992, he was relieved of duty in the Military Police Company and reassigned to the First Battalion Escort Platoon for the month of November. *Id.* The Government further argues that in December 1992, Razic was reassigned to the Independent Company of Diversionary Troops and remained with that company at least through March 1993.

Razic argues the Government's evidence falls short of establishing his membership in the HVO. He notes that the Government did not present testimony from any witness

with firsthand knowledge, even though the Government's exhibits identify multiple individuals with whom Razic purportedly served. Doc. 86 at 34. Razic also challenges Hoover's testimony regarding his purported signature on payroll documents, contends the Government failed to properly authenticate or contextualize the pay records, argues his testimony is consistent with a ghost payrolling inference and that his presence in Capljina in 1993 does not mean he must have been a member of the HVO. *Id.* at 37-66.

I have carefully considered the evidence and find the Government has failed to meet its high burden of clear, unequivocal and convincing proof that Razic was, in fact, a member of the HVO and then misrepresented or concealed that fact in applying for permanent residence and, eventually, naturalized citizenship. The Government relies solely on documentary evidence and historical context to place Razic in the HVO. While the Government often relies on documentary evidence in denaturalization cases, in many cases it has been able to supplement this evidence with other evidence that is simply absent in this case. *See United States v. Mandycz*, 447 F.3d 951, 957-59 (6th Cir. 2006) (relying on evidence of German guard-transfer rosters in addition to statements by guards who served with defendant who were able to identify him and explain his activities as a guard); *United States v. Firishchak*, 426 F. Supp. 2d 780, 789-93 (N.D. Ill. 2005) (defendant identified seven out of eight signatures on wartime documents as his, which also included his birth date, father's name, village, and town he lived in during World War II); *United States v. Kaymon*, No. 04-60003, 2007 WL 1012983 (E.D. Mich. Mar. 29, 2007) (noting the court received almost 200 exhibits and that documents showed dates on which defendant fired his weapon and engaged in other actions as a Ukrainian Auxiliary policeman); *United States v. Demjaniuk*, 518 F. Supp. 1362, 1369 (N.D. Oh. 1981) (the Government presented an identification card issued by the German SS that contained defendant's picture in addition to testimony from five surviving Jewish prisoners from the camp where defendant was a guard); *United States v. Palciauskas*, 559 F. Supp. 1294, 1296 (M.D. Fla. 1983) (evidence consisted of newspapers identifying defendant as mayor of city during time that Jewish ghetto was established there,

translations of orders from defendant signed in his capacity as mayor, memos from other government officials to the defendant as mayor and testimony of persons in a position to know and who claimed to have knowledge). Here, the Government did not present any witness testimony (except Rebac's) from individuals who purportedly served in the HVO with Razic, even though at least two documents (Exhibit 13 and 14) provided the names of many other individuals who purportedly served with Razic and would have firsthand knowledge about his HVO membership.[19]

As for Rebac's testimony, it is less than clear. Rebac claimed to have seen Razic regularly but did not explain, and was not even asked, in what capacity.[20] Doc. 65-21 at 25. Rebac testified that Razic was not in the section he commanded, but was never asked if Razic was, in fact, in the HVO at all. *Id.* When asked if he knew what Razic's duties would have been, Rebac shook his head 'no' and testified, "It didn't take . . . It wasn't much involved, and if, and then I just registered as one of them" before stating that it was a long time ago and difficult for him to remember details.[21] *Id.*

With regard to Exhibit 13, Rebac was asked "so the soldiers would get paid for showing up, but only some of them would actually go to the front line?" and he replied, "[i]t was just, like, a record. A record. They were recorded as, as present, but

---

[19] Of course, the mere fact that various forms of evidence presented in other cases was not presented in this case is not dispositive. Nonetheless, I find it relevant in evaluating whether the Government met its high burden of proof in this case.

[20] It would not be surprising for Rebac to see Razic regularly outside of the HVO as this was not a heavily populated area. The population of the entire Capljina municipality in 1991 was 27,000. Doc. 70 at 26.

[21] While I understand that Rebac's testimony was translated and there may have been issues with translation, the Government did not attempt to clarify these statements from Rebac or with the interpreter. I have reviewed both Rebac's video deposition and transcript and find these statements are consistent. While Rebac may have testified "he" instead of "I" was just registered as one of them, the interpreter often answered for Rebac using "he" to refer to Rebac. Thus, it is unclear if "he" would be referring to Rebac or Razic in this statement. It is the Government's burden to present clear, unequivocal and convincing evidence.

sometimes they were not even physically present there, let alone engaged in action. They were present only when, to sign when we needed to collect their salary." *Id.* at 36. These two statements, if true, give some credence to Razic's theory that Rebac registered individuals as HVO members and then either had them sign the payroll records or forged signatures so that he (and others) could collect their salary. While these statements may fairly be explained by translation issues, they contribute to doubts about Razic's membership in the HVO rather than providing clear and convincing proof of such membership.

With regard to the historical context, I appreciate the Government's argument, based on Dr. Tomljanovich's testimony, that it would have been unusual for Razic to be working as a civilian barber in the area at the time. However, there is no evidence from anyone who lived in the area at the time to confirm Razic's whereabouts or activities, or to otherwise describe what was happening in Tasovcici and Capljina. *See United States v. Osidach*, 513 F. Supp. 51, 58-92 (E.D. Penn. 1981) (noting evidence consisted of 14 in-court witnesses, video depositions of 7 witnesses and deposition transcripts of 5 additional witnesses, with several witnesses describing actions by Ukrainian police in their town where defendant provided alternative version of the role of Ukrainian police).

The only firsthand accounts in evidence are the testimonies of Razic and his wife, who testified that Razic was not in the HVO at any time. They described life in Capljina as relatively stable between July 1992 and June 1993, even though it was under HVO control, and stated that beginning in July 1993, they made plans to get their family out of the area as quickly as possible. *See* Doc. 72 at 6-7. This is consistent with General Petkovic's June 30, 1993, order to arrest and detain all military-age Bosniak males and the HVO's efforts to drive out all Muslims from the area. *See* Doc. 70 at 27-28. Videla testified she and her son, Denis, left in July 1993, followed by Razic's parents in August and his brother's family in September. Doc. 71 at 44-45. Razic testified that he wanted to save everyone else first and that he was still working in the barbershop in the summer of 1993. Doc. 72 at 7. Again, there are no firsthand accounts to discredit this. The

only other firsthand account in evidence is from Rebac, who led a section Razic was not in, could not testify as to what Razic's duties would have been and was never asked whether Razic was in the HVO.

Obviously, the documents are the Government's best evidence of Razic's HVO membership. I find that these documents are authentic, but I do not find them sufficient to meet the Government's very high burden of proof, which has been described as "substantially identical with that required in criminal cases – proof beyond a reasonable doubt." *Klapprott*, 335 U.S. at 612. While Razic's information is correctly portrayed on the documents, the documents also raise serious questions about their reliability to establish HVO membership. For example, Exhibits 31 and 32 are used to show that Razic served from July 1, 1992 through September 4, 1993. First, this is inconsistent with Exhibit 30, which lists Razic's "time of employment" in the HVO from April 4, 1992,[22] through July 1, 1993. Doc. 65-32. Second, it is unclear what the dates on Exhibit 31 are intended to reflect. The document lists a "date of joining" as July 1, 1992, and date of "entry" of September 4, 1993. Doc. 65-33. Nothing is listed under the date of "departure" column. *Id.* Dr. Tomljanovich testified that September 4, 1993, appeared to represent the time at which the information was registered or that documentation concerning service in the HVO would have been registered. However, Exhibit 32 contains the same dates (July 1, 1992, through September 4, 1993) with no column heading and Dr. Tomljanovich testified the only reasonable thing he could think of was that these dates represented dates of service. Doc. 71 at 12-13.

Assuming Exhibit 31 intended to list September 4, 1993, as a departure date, this also raises some questions. As noted above, July 1, 1993, was significant because this was the day after General Petkovic entered an order to arrest all Muslim males still fighting inside the HVO and to detain all Muslim males on HVO territory. Doc. 70 at

---

[22] Dr. Tomljanovich testified that April 4, 1992, was about four days before the HVO officially existed. Doc. 71 at 12.

26.    The Government offers no reasonable explanation as to how or why Razic purportedly continued serving through at least September 4, 1993 (and potentially up to October 1993), if Muslims in the HVO were ordered to be detained after July 1, 1993. While Razic's presence in Capljina as a civilian barber also seems contradictory to the historical context, it is the Government's burden to prove its claims.

With regard to the attendance and payroll documents, these purport to show Razic's presence in the HVO from August 1992 (Doc. 65-35) through March 1993 (Doc. 65-41). Exhibit 13 is dated November 1992 and lists the 23 members of the "First Battalion Escort Platoon". Doc. No. 70 at 29. Exhibit 14[23] is dated December 1992 for the "Independent Company of Diversionary Troops." *Id.* at 31. The exhibits contain some of the same names,[24] but raise questions about the authenticity of the signatures. For instance, the signature for Harisa Jazvin is different on each exhibit. While the handwriting appears similar, one is signed "Harisa J" while the other is signed "Jazvin Harisa". Other names in common between the two exhibits are Amer Kudra, Edin Sakoc, Dzevad Turajic, Selma Tabakovic and Admir Vegar. The signature next to Admir Vegar's name is the name of a different individual. Dr. Tomljanovich suspected this meant a different individual collected the money for Vegar. Doc. 70 at 56-57. In Exhibit 13, there appears to be the same signature for three different individuals. *See* Doc. 65-16 (lines, 7, 14 and 23). Dr. Tomljanovich testified that he assumes the signature is of the individual who received the pay. Doc. 70 at 53-54. There is no evidence or witness testimony in the record, aside from Rebac's, describing the signature-for-payment process.

Finally, all but two of the documents (Exhibits 13 and 14) are heavily redacted – showing only the entry for Razic. This makes it impossible to compare Razic's entries

---

[23] It appears this exhibit is an excerpt from a larger document. *See* Doc. 70 at 56 (in which Dr. Tomljanovich indicates it is numbered 31 through 58 and has a page number (2) at the top.

[24] Rebac's signature is on Exhibit 13, but not Exhibit 14. Razic's is on both.

on these documents with other entries and ascertain any similarities or differences between them. While I understand that the Government did not make the redactions (they were made by the government of Bosnia and Herzegovina), they reduce the weight I am willing to give these documents as the primary basis on which to revoke Razic's naturalization.

In short, the Government's evidence does not meet its very high burden of proving by clear, unequivocal and convincing proof that Razic was a member of the HVO. These events occurred over 25 years ago in a volatile area. The documents raise several questions and are not supported by credible testimony from witnesses with firsthand knowledge, or other persuasive evidence, to corroborate the meaning the Government seeks to attribute to them. Based on the record before me, I am not convinced, to a level "substantially identical" to beyond a reasonable doubt, that Razic was a member of the HVO.

### 2. Did Razic Participate or Assist in Acts of Persecution?

The Government argues Razic was ineligible for refugee status as a persecutor (Count 3) on two grounds. First, it alleges that he participated in the persecution of Milan Misita, a Bosnian Serb, on account of Misita's race, religion, nationality, membership in a particular social group, political opinion, or a combination of the above. *See* Doc. 81 at 42. Specifically, the Government alleges Razic took Misita into custody and transferred him into the custody of those who ultimately killed him.

Second, it alleges Razic assisted or otherwise participated in persecution when he participated in the killings of Ivica Bunoza and Martin Markovic and kidnappings of Rebac and Pehar, all Bosnian Croats. *Id.* The Government contends Razic "was also personally and actively involved in the events immediately prior to these extrajudicial killings and kidnappings" but does not specifically describe those alleged events. *Id.* It simply notes that other courts have found that evidence an individual was a guard at a prison camp was sufficient to find he was actively and personally involved in persecution.

An individual who commits acts of persecution does not meet the legal definition of a refugee under 8 U.S.C. § 1101(a)(42). Such an individual would be ineligible to adjust his status to a permanent resident. *See* 8 U.S.C. §§ 1159(a)(2), 1157(c)(1). If the individual was never lawfully admitted for permanent residence, he would be ineligible for naturalization under 8 U.S.C. § 1427(a)(1) and § 1429.

The Government's evidence of Razic's participation in persecution consists of a witness statement (Doc. 65-15) by Misita's wife, her video deposition (Exhibit 17) and transcript (Doc. 20) and Rebac's video deposition (Exhibit 19) and transcript (Doc. 65-21). The Government also argues that Razic lied about his involvement in the HVO and argues I should make inferences of consciousness of guilt related to his involvement in persecutory acts. Finally, it relies on the testimony of Dr. Tomljanovich to provide historical context of the alleged events.

Misita's statement, which was given in November 2011, provides in relevant part:

> On June 7, 1992, Tasovcici were [sic] attacked by HVO [Hrvatsko Vijece Obrane – Croatian Defense Council, paramilitary formation], which I saw that evening on a TV broadcast, and on that occasion I've recognized Tasovcici and certain locations there on a TV broadcast, and about all of this I got the impression that my husband will not make it out of there alive, which in the end turned out to be fact. As I later learned, on June 7, 1992, my husband went from our family home, which is located next to the main highway through Tasovcici, to his old family house, which is located in Naklo hamlet of Tasovcici, and there he was wounded by artillery fire, as far as I heard, in the neck, arms and legs area, and they tried to give him first medical aid, which was done there by a certain Meho from Tasovcici. As I heard further, the next day someone most likely reported Milan [to the authorities], and then to get him came members of Croatian Defense Forces [HOS – Hrvatske ombramhene snage, paramilitary] Edo Sakoc and Eso Razic, both from Tasovcici, who allegedly were taking him to Caplijina to turn him in to some kind of headquarters, and then they were met in Tasovcici by Zlatko Vegar from Tasovcici, Drazenko Pervan from Tasovcici and the late Dinko Kavada from Capljina. Zlatko Vegar then separated my husband Milan and [placed him] by some tree next to the electrical substation, and from a distance of some 5-10 meters shot him in such a way where he fired from the rifle the whole magazine worth of bullets at him. They left my husband's body there, while the next day

29

someone moved it to a courtyard, most likely of Huso Hasanagic's family house and there he laid dead for the next two days until the local Serbs buried him at the local cemetery in Tasovcici. I have also heard that someone came to that courtyard where Milan was laying dead and had cut off both of Milan's ears.

Doc. 65-15 at 4.

Stefa Misita's statement about the circumstances of her husband's death is based on information she received from Scepo Bekan, Razic's father-in-law, and Iva Preradovic,[25] a neighbor. She has no first-hand knowledge. *See* Doc. 65-15; Doc. 65-20 at 20 (in which Misita testified that she learned how her husband had been killed by putting various pieces together, meaning "different accounts [she] had heard from different people"). She explained that the accounts she heard in 1997 were more detailed than the accounts she heard in 1996. *Id.*

During her deposition in November 2018, Misita added a few more details, including that after Milan was wounded on the 7th, he stayed overnight at his family home. Doc. 65-20 at 14. On the 8th, he left his family home and went to another house where some women were hiding from grenades. *Id.* She stated that Bekan's account was based on what Razic had told him. Doc. 65-20 at 21. She explained Bekan told her Razic "actually thought that he would have saved [her] husband believing that he would have handed him over to the HVO HQ. But on their way to the HVO HQ . . . they encountered an even more extreme group so simply it happened owing to circumstances at that particular moment." *Id.* Bekan conveyed this information to her when he visited her upon the death of her father (date unknown) to express his condolences. *Id.* at 22. When Misita asked about Bekan's daughter and her children, Bekan told her Razic and Edo Sakoc had taken Milan and wanted to hand him over to headquarters. *Id.* Misita testified she had no other reason to know that Razic was part of the HVO or HOS. *Id.* She explained that Preradovic knew what happened to her husband because she was there

---

[25] Ms. Preradovic is deceased.

when he was wounded by a grenade and was in the group of women when her husband was taken out of the house. *Id.* at 23.

The Government's second basis of persecutory acts comes from Rebac's account of the Kvanj hill incident. He testified as follows:

> Q: When was the last time that you saw Martin Markovic?[]
> A: The last time I saw him, actually, he was dead.
> Q: When was that?
> A: Well, I think it was October the 10th or October the 1st. I cannot remember the date.
> Q: Of what year?
> A: 1993.
> Q: And when was the last time you saw Ivica Bunoza?
> A: On the same date.
> Q: Where did you last see Ivica Bunoza?
> A: At the same location like the previous one where he was killed.
> Q: How, how did you know he was killed?
> A: Because I was there.
> Q: Did you, did you see him killed?
> A: Not me, but a friend of mine from the same unit witnessed it.
> Q: Who was that friend?
> A: Kudra, Mirzo.

Doc. 65-21 at 15-16. Later in his testimony, Rebac clarified:

> Q: You said that you were told by Mirzo Kudra about who had killed Markovic and Bunoza, is that correct?
> A: He said that Mirzo Kudra saw it, not that, that he saw the killings of the two, of Markovic and Bunoza.
> Q: Did you see the killings?
> A: No, I didn't see the killings.
> Q: How, how do you know –
> A: Like I –
> Q: I'm sorry. Go ahead.
> A: But I saw where Kudra stood and where he was looking at and what was he looking at.
> Q: How do you . . . How do you know that Kudra saw the killing?
> A: Because I was looking in that direction at the time when I heard shots.
> Q: Where were you when you heard the shots?
> A: In a car.

| Q: | When you came to the bodies of Markovic and Bunoza, how far were those bodies from the car? |
|---|---|
| A: | Between fifty and sixty meters. |
| Q: | Where was Kudra when you heard the shot? |
| A: | On the curb. On the curb. He was standing on the curb looking in that direction. |
| Q: | How far was he from you? From your car? |
| A: | Between twenty and thirty meters. |
| Q: | How long after you heard the shots did you, did Kudra tell you who had killed them? |
| A: | Kudra did not say anything to me. So he simply pointed the rifle at me. So he went from the curb, he walked towards me, he pointed the rifle at me, and he told me, he told me, "So you are prisoner, prisoner. Sit in there." |
| Q: | How do you know that he saw the killing? |
| A: | Because he was looking in that direction as it all happened twenty meters away from him . . . . |
| A: | . . . . "After he killed those people, I do remember that I saw him walking towards me, and Kudra stood in front of Razic and said something like this: "No, you will not kill them . . . You will not kill them, too." |

. . .

| Q: | When he heard the shots, when he was in the car, could he see . . . At that time he was in the car when he heard the shots, could he see Markovic and Bunoza? |
|---|---|
| A: | No. No, I could not. |
| Q: | When he heard the shot . . . When he heard the shot when he was in the car, could he see Razic? |
| A: | No. |
| Q: | The first time he saw Razic that day was five or six minutes after the shots were fired, is that correct? |
| A: | Yes, that is correct, although it could be two or three minutes after I heard the shots or five or six. |

*Id.* at 27-32. Markovic and Bunoza were Croat, as is Rebac. *Id.* at 17.

I find the Government has not met its burden of proving by clear, unequivocal and convincing evidence that Razic participated in persecution making him ineligible for refugee status, and therefore, permanent residence. The Government is correct that

personal or voluntary participation in persecution is not required in order for a person to have assisted in persecution within the meaning of the law. *See Fedorenko*, 449 U.S. at 512 (concluding that the deliberate omission of the word "voluntary" compelled the conclusion that all those who assisted in the persecution of civilians were ineligible for visas); *Friedrich*, 402 F.3d at 845 ("The pertinent question is therefore whether Friedrich 'personally assisted' in persecution, not whether he engaged in direct persecution."); *Kalejs v. I.N.S.*, 10 F.3d 441, 444 (7th Cir. 1993) ("assistance [in persecution] may be inferred from the general nature of the person's role in the war; therefore, the atrocities committed by a unit may be attributed to the individual based on his membership and seeming participation"). However, the Government has difficulty proving by clear, unequivocal and convincing evidence that these events even took place in the manner alleged, much less that Razic was involved in any capacity.

The Government's evidence is not based on any eyewitness testimony. It is based on speculation and secondhand (and thirdhand) accounts. The weaknesses in this evidence are amplified by the fact that Misita and Rebac provided names of several individuals who could be expected to have firsthand knowledge. The Government did not produce, or explain why it could not produce, evidence from a witness with firsthand knowledge of the events and Razic's alleged participation in them. Many cases resulting in denaturalization are based on considerably more evidence, including firsthand accounts. *See Fedorenko*, 449 U.S. at 498 & n.12 (Government's witnesses included six survivors of concentration camp who claimed they had seen petitioner commit specific acts of violence against inmates of the camp with each making a pretrial identification of petitioner from a photo array with three witnesses making courtroom identifications in addition to petitioner's admission that he involuntarily served as an armed guard at the camp); *United States v. Szehinskyj*, 277 F.3d 331, 336-37 (3d Cir. 2002) (concluding evidence was sufficient to determine that defendant served as an SS Totenkopf guard based on six Nazi wartime documents retrieved from Russian, German, and Ukrainian archives that identified defendant by multiple personal identifiers and were consistent

with other documents in addition to credible testimony from defendant's purported alibi who contradicted his account); *Linnas v. I.N.S.*, 790 F.2d 1024, 1026-27 (2d Cir. 1986) (noting the Government presented eyewitness testimony that Linnas was chief of a Nazi concentration camp during the time period that he claimed to have been a university student in addition to documents signed "Karl Linnas, Chief of Concentration Camps" and "Chief of Tartu Concentration Camp"). *But see Hammer v. INS*, 195 F.3d 836, 843 (6th Cir. 1999) (finding assistance in persecution in the absence of admissions or eyewitness testimony).

Given the high burden of proof and that "the facts and the law should be construed as far as is reasonably possible in favor of the citizen[,]" *see Schneiderman*, 320 U.S. at 122, I find the Government has fallen well short of proving by clear, unequivocal and convincing evidence that Razic was involved in persecutory acts. Because the Government has not established that Razic was, in fact, a member of the HVO or that he was involved in persecutory acts, it is unable to meet the elements of any of the counts alleged against Razic. The Government's request to revoke his naturalized citizenship must be denied.

## V.     CONCLUSION

For the reasons stated herein:

1.     Razic's hearsay objections to Exhibits 1, 13, 14 and 37 through 39 are **overruled**. Those exhibits are **received** into evidence.

2.     Notwithstanding my prior ruling (Doc. 79) concerning evidentiary issues, plaintiff's Exhibit 14 is **received** into evidence.

3.     The Government's request to revoke the naturalized citizenship of defendant Eso Razic is **denied** as to each count and this case is hereby **dismissed with prejudice**.

4.     Judgment **shall enter** in favor of defendant Eso Razic and against plaintiff the United States of America.

34

**IT IS SO ORDERED.**

**DATED** this 22nd day of October, 2020.

_____
Leonard T. Strand, Chief Judge